### THE NO. 310.

### THE NEW YORK CENTRAL NO. 35.

### THE GRACE.

### No. A–13797.

District Court, E. D. New York.

Nov. 9, 1933.

Purdy & Purdy, of New York City, for libellant.

Jacob Aronson, of New York City (Kenneth O. Mott-Smith, of New York City, of counsel), for the New York Central No. 35.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine and A. V. Cherbonnier, both of New York City, of counsel), for the Grace.

BYERS, District Judge.

The libellant, as owner of the covered barge No. 310, seeks to recover for damage it sustained on the afternoon of March 14, 1933, when it was taken in tow by the tug Grace to be moved from the outer side of pier 33, South Brooklyn, to the inner side. This occurred at about 2:30 in the afternoon, when an ebb-tide prevailed, on a clear day with no wind.

The Grace had the barge on her port side, having picked her up by nosing in between the barge and the pier, and, after making fast, the tow swung around at a distance of nearly 1,000 feet south of the gap, in a complete semicircle, so that for about that distance the tow travelled in a southerly direction with the tide under foot; at a point off the southerly end of pier 33, the course was changed so as to swing the barge around and head into the gap; the New York Central Diesel lighter No. 35 was headed out through the gap under circumstances to be described, and when each discovered the other, the tow and the lighter were headed so that a collision was probably inevitable. Both the tug and the lighter stopped and reversed their engines, but too late to avoid contact, and the starboard bow of the lighter struck the starboard bow of the barge, but no damage was done to the tug Grace because the latter was made fast so that her bow was aft of the bow of the barge.

While the evidence is not precise as to the strength of the ebb-tide, it is found that it was not less than two miles an hour.

The libellant's barge No. 310 was 85 feet in length and 28 feet in beam; the tug Grace was 78 feet long and about 20 feet in width. The lighter New York Central No. 35 was 122 feet long and had a beam of 32 feet. It is possible that these dimensions do not appear in the testimony but in effect were stipulated.

The gap in the Atlantic Basin is about 300 feet at the opening, representing the navigable water between piers 33 and 38.

The questions to be determined are, first, whether the tug Grace navigated her tow in accordance with the requirements of the sit-

uation, in view of the ebb-tide, and, second, whether the New York Central No. 35 was properly maneuvered in making her exit from the Basin.

As to the first, it is found that the Grace did not swing wide enough, in coming down alongside pier 33, to enable her to round to and breast the ebb-tide in a sufficient arc to enable the navigator of the tug to open up the gap in such a way that he would be afforded a clear view of the Basin and an emerging vessel. The circumstances are quite like those discussed by the Circuit Court of Appeals for this Circuit in The Poling Bros. No. 2, 62 F.(2d) 357:

"We agree with the judge that the 'Poling' was at fault for coming down too close to the pier. * * * The actual distance is a mere guess, but we may safely say that she was within three hundred feet. This was too close, especially as she was on a tide of four knots, and though her engines had been stopped, she had not yet run off her way. In view of the possibility that other vessels might be coming out, she should have kept further off until she could see into the basin. If this required her to turn more than ninety degrees and enter against the tide, it was not troublesome to do so, and she could not be excused if it had been. Her actual course made dangerous the exit of the 'Sterling,' or any other vessel so situated."

It is true that the tide in this case did not equal in strength the conditions described in the foregoing opinion, but safety of maneuver was just as requisite here as there.

The testimony differs as to the exact distance between the barge No. 310 and pier 33 at the time that entrance was attempted. The barge Captain puts it at 30 to 40 feet, and the Captain of the tug says 300 feet. His other testimony, in which he vindicates the course that he followed instead of rounding to against the tide, suggests that his estimated distance last above stated is not accurate, and it has not been relied upon in reaching this decision.

It is found that the tug was really shaving the end of pier 33, although her Captain says that he would have rounded to well out in the stream if he had had a heavy tow to maneuver. It is thought that the evidence discloses that the Captain deliberately elected to make an entrance to the Basin which was opposed to the actual requirements of the situation because he heard the slip whistle of the No. 35 when he was alongside pier 33, and says that he at once stopped his engines and drifted slowly with the tide down toward the southerly end of pier 33; had he been far enough off that pier, it is reasonable to suppose that the collision would not have occurred.

The second question has to do with the handling of the Diesel lighter New York Central No. 35. Just before the collision, this vessel was on the inshore side of pier 36 in the Basin, and made out for the entrance under slow speed, keeping about midway between the pier ends; the Captain was in the pilot house, and, when about 400 feet from the entrance, he blew a slip whistle and went into half speed, which is five knots an hour. He heard the whistle from outside the gap and recognized it as that of the tug Grace, but did not slacken his speed. He headed for the outboard end of pier 33 so as to keep about 20 feet off, having in mind that he would have to buck the ebb-tide in getting out of the slip. As the lighter approached pier 33, the shed obscured the navigator's view, because the pier shed extends to within 15 or 20 feet of the pier end; he says that the tow was about 60 feet away from his vessel when they came into mutual sight. He immediately signalled to go into reverse, and the engineer testified that the engines would not turn in that movement for an interval of about 5 or 5½ seconds; probably the lighter did not entirely lose her way, as she was travelling at about 500 feet a minute, which is better than 8 feet a second. The cross-examination of the Captain on this point is significant:

"Q. In other words, knowing that you were coming out of the gap and another vessel was coming in, you kept right on going, is that right? A. Is that a yes or no answer?

"Q. That is a fact, isn't it? A. No, that is not a fact.

"Q. Didn't you keep on going? A. Because I know the practices that Grace does there.

"Q. Did you keep on going? A. Yes, to get out of his way."

The foregoing seems to imply that the Captain of the lighter recognized that under ordinary circumstances it would have been his duty, upon hearing the whistle from the tug Grace, to arrest the progress of his own craft sufficiently to have it under absolute control so as to avoid contact with what he knew to be an incoming vessel; and that he elected not to do that because he thought he could forecast what the tug Grace would do. Whether he was right or wrong in his guess, the fact remains that the collision occurred, and it might not have occurred if he had kept his vessel under control.

For these reasons, it is thought that the libellant has sustained its burden of proof, and that both the tug Grace and the lighter New York Central No. 35 must be held equally at fault for the damage sustained by the barge, with costs, and a decree to that effect may be settled on notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.